Good morning, your honors. I'm Richard Johnston, and I'm here on behalf of Ms. Jackson and Ms. Schoenman, the appellants. The reason we're here today is that the analysis employed by the district court would have been an abuse of discretion had the same analysis been applied by an unconflicted plan administrator who had been granted full discretion. The court granted to Prudential summary judgment based on a record which had internal, very significant factual disputes and very many genuine issues of fact. In so doing, the court failed to address some very significant evidence, and we believe misapplied some very important legal principles about the treating physician rule, among other things. The court disregarded the findings of the Social Security Administration in this case. I mean, as to that, there was an acknowledgment that Social Security had reached a certain decision. The court in a footnote referred to the decision in a part of its order in which it denied Prudential's request that Ms. Jackson be made to reimburse Prudential for the Social Security benefits she had received. But the court did not discuss the Social Security decision at all in its decision on the merits of the disability claim. And it wasn't the plaintiff applied for and received Social Security disability benefits. That's not even in the footnote. That's in the text. No doubt the court knew about it. The court certainly knew about it. You're not contending that the court's bound by that. So I'm not sure what exactly the deficiency is. Well, we're contending that just as if an unconflicted plant administrator who had discretion and knew of a Social Security decision did not address the decision in reaching its determination, for example, as in the Montour case. I certainly know the Montour case. You started by saying disregarded, but in fact the court regarded. It's clear that the court was aware of the Social Security decision, found it not determinative, not persuaded by it, and moved on. I'm not sure it's quite the same as contending that it was disregarded or simply missing from the field. It's not missing from the field. It's right here in print. That is certainly true. And I do not mean to suggest the court was unaware of it or just missed it when I say it disregarded it. What I do mean to say is the court did not address its effect at all on its decision. The manner in which the court dealt with it was in the footnote, and it said that a Social Security decision is something that may be considered but is not binding. And indeed, we did not argue it's not binding. What we argue is that while the court acknowledged that it's something that may be considered, it's not apparent from the order that the court actually considered it, any more than Prudential did. In Prudential's final decision letter, Prudential went to the trouble to say we acknowledge that the Social Security Administration has found Ms. Jackson disabled. But we're just not going to follow it. It didn't talk about why the Social Security Administration found her disabled, what the facts and circumstances were that led to that decision. I'm sorry. You're talking about the ---- It did not. The court below did not take enough consideration in that it did not talk about just why it was the Social Security Administrator reached a decision that it did. It did not, nor did it offer any explanation as to why the Social Security decision was not persuasive or did not merit any weight in its consideration. It simply acknowledged that it occurred and moved on. I think that's particularly significant in a case where the court also imposed a requirement of objective evidence on Ms. Jackson's showing, which is nowhere to be found in the planned document. Well, what was their objective evidence that supports the conclusion that she's fully disabled? Well, we have, first of all, the acknowledgment by the physicians who injured her spine that that incident, in fact, did happen. These were eyewitnesses who said that they botched the spinal injection in 1990, 1997. And it might have been 95. I'm sorry. It was 95 or 15. But that doesn't mean that there was an incident doesn't tell us that she's limited. I'm really looking at what's the objective evidence that explains or confirms her own description of the pain and the limitations. Part of the problem is, of course, it is a pain-based case, and pain in and of itself is not subject to objective measurement. And so we look for evidence of a condition that could cause the type of pain that is alleged. And that is why I think it's relevant that the doctors who injured her admitted that, in fact, the injury did occur. That injury is an injury of the type that could cause the type of pain we're talking about. But we do also have limited range of motion findings. We have Dr. Pavey's findings upon his examination of muscle spasms. We have the fact that Harrington rods were installed during the surgery in March of 1998. That's significant in terms of objective evidence because, from that point forward, the spine could not be imaged. The Harrington rods did not allow an MRI or any other sort of a picture to be taken of the spine. And so, from that point forward, that type of objective evidence simply was not available. And we do know from the case law that to require objective evidence or any evidence at all, indeed, which is simply not available, is an abuse of discretion. We also have what we've argued for in our brief, a lot of circumstantial evidence, which we think has to be brought to bear in a pain-based disability case. We do have the physician's opinions, and not only Dr. Light's. I think it's significant that the district court erroneously said that Dr. Light was the sole physician who found that Ms. Jackson may have been disabled, when, in fact, we know from the record that Dr. Day and Dr. Pavey also found not that she may have been disabled, but that she, indeed, was disabled. And so that's an affirmative misstatement of fact by the district court. That's also important because when you do look at the circumstantial evidence that we believe has to be brought to bear in a case where objective evidence is not the condition is not amenable to objective evidence, among those factors would be the opinion of the treating physicians. There would also be, as I mentioned, the existence of a condition or an injury that could cause the type of pain that the claimant is describing. And there's also, and I think it's important in this case, the claimant's credibility. We have a claimant here who worked for 18 years at Wilson-Sensini before her condition prevented her from working further, who tried to go back to work unsuccessfully, who ended up filing bankruptcy and losing her home. And that is not something that a person would do if they were remotely able to work. And there's absolutely no indication of malingering, right? Nobody has suggested or have they? No, there's no suggestion by anybody. Any examining doctor, there's been no indication or suggestion that they doubt? Indeed not, to the contrary. Her doctors all vouch for her credibility. Doctors who've treated her for several years and have gotten to know her. It's also, I think, significant that the treating physician rule, I think, was misapplied, both by Prudential and, I think, by the district court. The district court, as I read it, seemed to say that because it's not required that the opinions of treating physicians automatically control, that therefore their opinions need not be considered at all. And, indeed, we also know that the district court didn't even mention Dr. Day or Dr. Pavey. Besides not acknowledging they found disability, their names may have appeared in the opinion. I'm not sure. But he never, ever addressed what they had to say about her condition. And when he talked about Dr. Light's opinions, he invoked the treating physician rule to say that he's not bound by it. Well, indeed, he's not. But the other observations he made, such as the fact that Dr. Light supposedly changed his mind about Ms. Jackson's disability as the date he had picked for when he thought she might be able to return to work is somehow indicative that his opinion doesn't merit any weight. He predicted in the summer of 1998 that she might be able to return to work in January of 1999. In the interim, her condition fluctuated. She had a roller coaster recovery from the surgery. January of 1999 comes along, and it turns out that she's not able to work again. The district court took that, the fact that the prediction that had been made halfway into 1998 turned out not to come to pass, as some indication that Dr. Light's opinion was not to be given not only controlling weight, but really not to be given any weight at all. Excuse me while I check my notes. Isn't it fairly common that, quote, coming out from the operating room, doctors' prognoses are often very positive and favorable? Well, I think that's probably human nature as well as physician nature, indeed. And that in cases of this sort, in my experience, much more commonly in Social Security cases, as time goes forward, that hopeful and optimistic prognosis is cast into doubt and proven to be erroneous. Well, certainly by its very nature, prognosis is a prediction, and it may or may not come to pass. I think another very significant point in this case has to do with the district court's treatment of Ms. Jackson's occupational duties juxtaposed against her medical condition. Everyone ultimately agreed, including Prudential in its final denial letter, that Ms. Jackson's occupational duties required that she remain seated in her chair and tethered to her computer all day. The phrase that was used in the record several times was, She had to remain seated in her chair in order to perform. Didn't Prudential sort of hang its hat on the as-needed phrase in terms of when she could get up and move around? Well, it did. It hung its hat on that one phrase in one e-mail that appears in the record. We don't think that's substantial evidence in the circumstances of this case, given the quantum of other evidence and the quality of the other evidence. The Loban case from last year, I believe, is virtually on all fours with that. In that case, coincidentally, Prudential had a letter from the claimant's employer which indicated the claimant had to travel a great deal and spend a lot of time on planes, and the district court didn't address that letter at all. And the case was remanded to the district court because, disregarding that specific and detailed evidence of what the claimant's occupational duties were, rendered the district court's analysis insufficient. Here as well, the district court never addressed the specific evidence about Ms. Jackson's occupational duties. What the district court said is that she needed to be able to move about intermittently, and it went on to conclude, without explanation and without reference to evidence, that in her occupation she could do so. Given the really detailed report we have by Ms. Conciatori, who had been Ms. Jackson's immediate supervisor and submitted a letter to Prudential, that Prudential never mentioned at all after that point about her job duties, about the fact that not only did she have to stay seated at a computer, literally tethered to the computer, connected to the computer by a cord all the time, she was monitored. People were watching her at that help desk, the way Wilson Sassini set it up. If she got up to go to the bathroom, she was monitored and expected to return immediately. They disabled the do not disturb function on her phone, so she couldn't even get a break from the phone ringing. She had a quota of four calls per hour, every hour, that she had to handle, and these were substantive computer troubleshooting calls from other folks at Wilson Sassini. So she wasn't able to get up and move around when she needed to. The only evidence supporting that in the record is that one e-mail where somebody from Prudential tell or somebody from Wilson Sassini, rather, tells Prudential that, indeed, she does perform all her work sitting at her desk. Indeed, she doesn't get up to move around the office as part of her job. But at the end of that description, they tacked on the phrase, with the ability to move about as needed. That's all Prudential has to hang its hat on here. And we just think that's insufficient from a substantial evidence point of view, compared to the other much more specific evidence that's in the record and that we think really trumps that. There's also one other principle about that I might mention, and that is by analogy to the cases about lay opinions. If you have a case, a jury case, where the actual information, the actual evidence is sufficient for the jury to come to its own conclusion, then to have a lay witness give an opinion about what that evidence amounts to is improper. And we cited a couple cases about that. What we have here is somebody from Prudential giving an opinion that her occupational duties allowed her to move about as needed. But when we look at the evidence of what those occupational duties actually are, we don't need someone's lay opinion about that. It's very clear that those duties don't allow her to move about as needed. If there are no further questions, I'd like to reserve my last minute for rebuttal. Thank you, Counsel. Thank you. Good morning. May it please the Court. Thank you, Your Honors. I'm Tad Devlin, appearing on behalf of Dependents Appellees Prudential and the Wilson-Sincini Long-Term Disability Plan. I'd like to address some of the points made by counsel. First of all, with regards to the standard of review applicable here, this Court is reviewing this decision for the clearly erroneous standard. Plaintiff asked for a 52 determination in her motion, under 52. And Kearney, she asked for it and she got it from the district court. Judge White issued a 52 determination. I don't think he issued that, because he says he grants a cross-motion for summary judgment. He didn't say he's finding facts based on a Rule 52 motion. So why do you say that it's a clearly erroneous standard? Well, I would submit to this Court that if you look at the contents of his order and the detail that he went in, and evaluating the evidence and looking and really focusing on Dr. Light, the treating physician, as opposed to the reviewing physician, so really giving credence to the treating physician, and then the outcome and what I'm not sure exactly what page, but said in the alternative plaintiff asked for a 52. Essentially, plaintiff said we don't need to have a 56. We can go right to a 52 based upon the overwhelming evidence. So I want this Court to weigh it. The Court found the decision to be correct. So I would submit to this Court that unless there is a clear mistake found upon the record by the district court, it should be upheld. And I can, I would submit that even if we were looking at this under a 56 standard and looking at this decision on de novo, there's no genuine issue of material facts sufficient to upturn the lower court's decision. Why not? The evidence on the side of Jackson, if you put the evidence on the side of Ms. Jackson, you take a look at Dr. Light's letters. They increasingly, they're one-page letters in the record that say improvement, suggesting exercise, walking, go to the gym, x-rays, objective medical, not objective evidence in terms of disability, but objective testing that shows what is going on with this woman's body, what's going on with her neck, x-rays, CT scans, MRIs, all show improvement, healing. Every single one of his letters along the way shows progressive, suggests that she can continue to walk and exercise. Then, as her job, as she loses her job, she calls Prudential in the soap notes, internal note dialogue. She calls Prudential, and she slowly starts to realize that Wilson-Sunstein is not going to give her what she needs. They're not going to let her telecommute, okay. She asked for it. She thought she had a good relationship there. Whatever happened there, it wasn't going to happen.  Am I eligible for benefits? And they said, well, were you actively at work when this happened? It's in the notes. She says yes. She proceeds to the surgery. Then, after the surgery and after the claim is denied, Dr. Light says, without any basis, still with the same level of restrictions that he had placed upon her, first 30 pounds can bend, and 30 pounds and 20 pounds, I will submit, are well above the level of lifting that she would be required to do as a help desk analyst in an IT department at a law firm. So he, on her side, it's everything is good. She's going to return to work. He anticipates she's going to return to work. He says she's going to return to work January 99. Then, as the job is no longer available, the ability to telecommute or work under her, I guess her desired schedule, and then the claim is denied. On desired conditions, yeah. Oh, sure. Well, she's able to drive, so I'm not, there's a, I challenge that. I mean, she's able to drive. She's able to do laundry. She lives alone. She's able to do household chores. She's able to grocery shop. To me, if you can do all that, how do you explain the Social Security Administration's decision? Well, there's two of them. The first one finds, and to talk about the credibility, well, I'll explain by talking about what they found and then explain why it doesn't really apply here. But, in fact, if we applied here, it helps here. So the evidence of light and the Social Security determination on the first one, they actually challenge her credibility a little bit. Right, but then they have a second decision. They do, and they give her an award of benefits based upon that decision, okay? Well, I mean, stop right there. I mean, the district court said, and it's true, that's not determinative on this. But, on the other hand, logically, this sort of concentric circles, Social Security Administration, not only it's not the question of whether or not you can go back to work in your job, it's any relevant work. So, logically, if she meets the higher standard, she should meet the lower standard. Now, I grant you it's not binding, but I didn't see any reasoned rejection of it by the district court. I mean, it just says it's not binding. But I don't see any evidence that the district court considered it and explained why it shouldn't take it into consideration. Well, I will address that. First, I don't think the district court really needs to go. I will submit that I don't think the district court needs to go through a line-item detail about every one of its so in response to counsel's position on that, and then what was in the mindset of the district court when it wrote its ten-page decision would be tea-leaf reading. But, however, we are on a de novo case. The SSA grappling, if you will, comes up out of Montour. That's an abuse of discretion, conflict of interest case. And so let's just put that away. What counsel would have you believe is that the district court is acting as though it's the payor and decidor of the claim as though we're under abatee or a Montour analysis. And that's just not the case. We're under de novo here. It's anew. Okay? And so even if you take a look at the SSA determinations, you've got one going one way, another going the other. This SSA has different criteria, first of all. If you age is a factor, it's not here. But they have certain checkmarks in the SSA regs. And if you hit a certain number of checkmarks, the presumptions are you get tie goes to the runner, tie goes to the claimant. You get your benefits. That is wholly different than an ERISA-governed plan and a private plan here. I understand that often it's more strict. I'm sorry? Often it's a higher standard. It's tougher for the claimant to meet the standard under SSA. I would not necessarily – I don't want to challenge the Court, but I think that they get presumptions. If you – they get, you know, the benefit of the doubt, if you will, in SSA. So I think it may be easier, even though the language – and also we've read about it in the papers. I mean, the ALJs have been going – kind of getting – I can just say we see a lot of Social Security cases, so I don't think we're going to resort to the newspaper characterization of the ALJs. I will just submit there's been a lot in the papers about ALJs granting 99.9 percent of the cases, kind of a boom. Regardless, it was certainly considered, which is all that has to be done by the plan, and considered by the district court. Even if you look at it, you've got two decisions going two ways. They didn't even have a hearing on the second one. They had a hearing. They saw Ms. Jackson at the first SSA level. I would submit to this Court that the latter decision should not be binding upon whether or not she gets benefits in this case based upon a plan that's not governed by SSA rules. Not governed by the criteria there. And if you have a certain disease or condition in SSA, degenerative disc, then you get – you are on the list of approved disability conditions, if you will. And I think the SSA decision even says that. We find you impaired under this reg. If there are no more questions on that, I'll let you go. Well, what about the prudential's demand for objective evidence? Was that appropriate under the contract? And did they actually consider factors that might have caused there to be a lack of clinical objective evidence, namely the Harrington rods? Two questions. Okay. The plan does not call for objective evidence, and that's kind of been weaved into the record here, and it exists. I'm not going to avoid that. The burden of proof is on the claimant to prove disability under the plan. The plan is not precluded from asking for evidence beyond what you say. So – and what we have here is objective evidence. We have – they have MRIs, they have X-rays, they have CT scans. That's oftentimes what claimants are asked to go get to either perfect or help give guidance to their claim. But prudential seemed to be, and I think understandably at the outset, doubted the existence or contributing aspect of the spinal injury that occurred during the – with the injection I came away with. Needle injection, right. And it took some time, I think, for the plaintiff to say, hey, wait a minute. This is part of my condition as well. And it just seems to me in reading the record that by the time that evidence came forward and the explanation about the Harrington rods and their effect, it did not get the kind of attention and consideration by prudential that it ought to have. Okay. So it seems to me it kind of repetitively says objective evidence, objective evidence. And the doctor says, well, this is one – this is a kind of injury. We cannot give you the proof that you're demanding because the Harrington rods prevent us from doing so. Well, the needle injection is – I don't want to say it's a bit of a red herring, but it's brought up – I will submit that the record reads that Ms. Jackson was looking back to anything. Oh, I – there was a needle injection in, what, 95 or maybe even 93, three needle injections. And the medical records at the time it occurred cast a little bit of doubt upon its validity. And she's got numbness in her legs. I don't even – I don't think you can test that. But I think we're kind of losing sight of what's important here. It's a one plus one must equal two equation. Just because you have pain or a needle injection or degenerative disc disease or you have neck fusion surgery does not mean you're disabled. Even if you have MS, to use a – I have some MS cases. Even if you have MS, it doesn't mean you're – and I have MS folks who work. It's a one, you have to have a physical condition or disease plus limitations, functional incapacity, to equal two, disability under the plan. You know, everyone's focusing, or I should say everyone. And number two looks to the actual job that she had to do and its effect upon her physical limitations, correct? In the national economy, yes. So it's not – it's not necessarily her job. But a job similar – with similar circumstances as hers, correct?  And so if you look at her job, and they did, and it's not as though in Loban or in other cases where they just look to the DOT or look to some manual or online to see what does this job do. They actually spoke with the people at Wilson-Suncini, with the HR department. The letter from Robin Cacciatore is, curiously, without Wilson-Suncini letterhead. We don't even know if she's still there. The HR department, I know from our firm – She was the one with direct, firsthand understanding of what her job required. Vouching – Or what the job that she did required. And I will submit vouching for the claimant at that point. And saying anything – I mean, there is evidence in the record that the claimant went back to the employer, Wilson-Suncini, and said, look, you're a big law firm. Help me get my disability benefits. I don't know what happened internally with – or that the employer is going to – She didn't say help me get my disability benefits, but please help me figure out why I'm not getting them or look into this or something to that effect. And then there's a disconnect between whether or not Robin Cacciatore, if I have her name right, even considering her statements in her letter, and I'll get to those in a second, but there's a bit of a disconnect about going from the HR department. Her job duties continue to get more restrictive and to the point of not really believable. No one is tethered to their desk. That's – and 99 percent of the time – But it recovers under your policy with that. I mean, with back injury, with Harrington rods, I mean – Not necessarily, Your Honor. No. I mean, if you've got something beyond improvement in all your objective – The common back injury case, I mean, where you feel severe. And there's no doubt about that. She's got Harrington rods in there. She's got physical symptoms. But typically, you've got to allow for some moving around and so forth. And you're saying, well, of course you're allowed to move around. And they say no. They disconnected her phone and so forth. Well, I mean, that evidence – Most Harrington rod cases, there are driving restrictions. There are all sorts of restrictions. And there's no driving restrictions in this case. Yeah, I know. I mean, and so what we've got is an employer, and then the employer is saying she has the ability to move around. Of course no one's tied to their desk. That's what the employer says directly from the HR department. Then you've got Robin Cacciatore saying, well, actually – And then she says the things that Your Honor referred to is that they're monitoring her. She has to do four calls a day. I mean, with the advent of where we are in technology and the ability – And I know this firsthand because I see the IT department. I know what they do. They have headsets. They can move. You're not strained to your chair. What she's saying is that – and the limitations don't add up. Let's say she's in the middle of a call and she feels debilitating pain. She can't simply hang up on that caller and say, listen, I'll get back to you once I feel better. There's nothing in the record that suggests that, is there? There's nothing – no, there's not. There's nothing in the record that suggests that she couldn't do the opposite of that, that she could say, look, I'm – she works at a law firm that's not a fly-by-night operation. I mean, I think they are – we have an ergonomic department. The guy walks around and makes sure you're feeling good in your chair. I mean, if this woman was told that she could not – we're speculating about it. Let me ask you. There's simply nothing in the record to suggest malingering on her part, is there? If you can just read that, tell me, please. It's not so much lingering as though it's suspicion. I mean, there is – if you look at the medical records hard, and I have, and I'm sure this Court has as well, but there is an indication that she's tried everything, that she claims she is in pain. She claims she can't sit. Dr. Light is – he essentially runs through every single thing he can do, and no matter what treatment he gives her, she continues to claim that she is in pain. And he even says, after the surgery, she comes back to him. What about the plaintiff's contention, the claimant's contention, hey, I worked for 18 years. Even assuming I had a sympathetic employer who the supervisor now exaggerates the restrictiveness of my job, why in the world would somebody who could do a job, had done a job, literally walk away from it and suffer the consequences she did? Doesn't that enhance her credibility very significantly? She worked there a long time. I would somebody able to manage, inflict that kind of financial catastrophe upon herself, betting against the come that maybe someday she might get some benefits. We don't – we – I submit to this Court. I don't really want to – I disagree that this Paul's graph theory of causation led to her demise. I just think that is far-fetched and not really believable. I don't know what happened at the firm. She – they moved her from one job – they moved her from the word processing to the help desk. They accommodated her. We have people at my firm that have been there a long time, belt-tightening. Next thing you know, they're no longer there. The attorneys are there and we're forced to – we don't have secretaries anymore, or whatever the case may be. The loss of her home, her own financial situation should not be borne upon – I think basically it's distinguishable from the case, and maybe this is Judge Carr's point, where somebody has not had a successful work history. Perhaps it's their first job and they have an injury like this. I mean, she – at least for 18 years, she's tried to work. That's the point that may help her credibility. Sure, sure. But we – But, you know, when you say – I guess going back to your argument about subjective reports, I mean, that's what we see in almost every back case. But medical experts also can evaluate secondary gain and whether they think the person's symptoms are real or not. Sure. I mean, back injuries are tough to treat. And these cases – the pain cases are difficult. And so what you do look to is the activities of – and the case laws suggest this, and it makes sense. Then you don't have the deposition of the claimant. You don't have her testimony. The SSA did, and interestingly, after the first hearing where they had the live hearing and they had a physical examiner of her, they did not find her meritorious of disability. I think that's weighty evidence. You've got to look at the activities of daily living, able to do chores, able to walk, able to exercise, able to drive. If you're able to drive, to me, I would – I've seen cases, and I'm sure this Court has as well. That's significant evidence. She does not – another point that kind of hurts her credibility. She doesn't contend that her pain is constant, does she? That it's always with her? No. No? That it comes and goes? And she even says that she can sit for periods of time and she can stand for periods of time. She can probably drive for periods of time, but that doesn't mean she can be a truck driver. But her job here is not a truck driver. I'm just saying that the fact that she can drive is of maybe limited significance in terms of her ability to do this job. Okay. I mean, I think it's a factor to consider. I think it's one of many, and I think on the totality of this record, the lower court got it right. This claim lasted a long time. There was significant peer-to-peer contacts. There was significant consideration by prudential of every single piece of evidence she submitted, every one of Light's letters, every one of the x-rays. They called her employer. They grappled with the SSA decisions. So even if you were to look at this case under a Montour analysis, which it's not because it's a DeNovo case, it passes. And to her credibility, she didn't really do anything to help herself, if you will. If you look at the records, they said try exercising in a pool, try exercising in the gym, try exercising at home, try walking around at home, maybe losing a little weight, any of these things. And not one of them are indicated in the notes anywhere that she tried it, not one. Our questions have taken you far over your time, so thank you, counsel. I appreciate it. Thank you. What about the failure to try? What about the failure to follow those instructions and advice? I don't know that that's quite accurate, Your Honor. There is in the record an indication, for example, that her physical therapist told prudential that she was very compliant with trying to get better and going through her physical therapy. It just didn't work out for her. She is susceptible to medication effects, so her ability to take pain medication is limited. That's in the record. I don't have a page cite for it as I stand here, but that's in there as well. And I think her effort to return to work speaks volumes for the extent to which she wants to get better and work again. She has no interest in being disabled. I think that's clear from the record. A couple other significant points, I think, is that the initial Social Security determination did not find her not disabled. It found her disabled for a closed period of time, and the reason they concluded she could work is that there was a range of jobs she could perform, provided that those jobs provided her with a sit-stand option. Her job at Wilson-Sonsini did not. So even the initial Social Security administration finds that the job at Wilson-Sonsini is not a job that she's capable of doing. That job was in no sense an accommodation. It was her transfer to the help desk, which triggered the ultimate deterioration in her condition, which ultimately rendered her disabled, which is additional evidence that that occupation is a nonstarter for her given her medical condition. That occupation is what ultimately led to her disability. Finally, I would just ask the Court to consider that I really do think that this matter should be reamended for an award of benefits, given the evidence on the two critical questions of her medical condition and the duties of her occupation. Her medical condition requires that she be able to move around. Everyone agrees with that. The district court says she has to move about intermittently, given her condition, and Prudential agrees that her occupation requires her to sit 99 percent of the time. That's in their final denial letter. They finally adopted that as their occupational definition, but then seized on Dr. Bauer's report to say, but she can sit for an hour at a time. And we know from the evidence we tried to submit that Dr. Bauer's views in that connection are open to some serious skepticism, given the materials we submitted for judicial notice and his opinion, apparently, that no matter how much pain you're in, anybody can sit for an hour at a time. And on that score point ---- I don't think we have to consider that to get to a decision in this case. Well, I finally would just add, regarding the Rule 52 issue, we did ask for a Rule 52 judgment, but we did ask for that in the context as well of submitting extra evidence on this very question of Dr. Bauer's and MES's bias and credibility. We don't know what the district court did with that. Prudential objected to it. The district court never mentioned it. District court didn't hold oral arguments, so we didn't get to address it there either. But when we asked for Rule 52, it was connected with bringing in this extra evidence, and, indeed, the court rendered summary judgment not a Rule 52. Well, the court speaks to its journal, and the journal says, I grant summary judgment. Indeed. Thank you.  Thank you both for your arguments. They've been very helpful this morning. Thank you.
judges: Carr, Thomas, Clifton